# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DONNA DAVIS, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF RICHARD DAVIS, AND MINORS CODY DAVIS, KATHERINE DAVIS, AND MEGAN DAVIS, | § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION H:07-505 |
| MONTGOMERY COUNTY AND GARRETT BURLESON, | § § § | |
| *Defendants*. | § § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Donna Davis ("Ms. Davis"), individually and on behalf of the estate of Richard Davis ("Davis") and minors Cody, Katherine, and Megan Davis, filed this civil rights action pursuant to 42 U.S.C. § 1983 for alleged excessive force during an altercation between Davis and Montgomery County Deputy Garrett Burleson ("Burleson"). Defendants Montgomery County ("the County") and Burleson have filed a motion for summary judgment. Dkt. 35.

Based on the pleadings, the motion, response, and reply, the probative evidence, and the applicable law, the court finds that this motion should be GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND[1]

---

[1]The factual exposition in this order is taken from Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. 40), which is supported by deposition testimony and reports made during the course of the County's investigation (Dkt. 40, Exs. A-O). Though the court makes no judgment regarding credibility or ultimate truth, it must present the facts in the light most favorable to the plaintiff, and it has done so here.

On December 13, 2005, Burleson responded to a routine burglary call at the home of Davis's next-door neighbor, the Romo family. The Romos were remodeling the home, and earlier that day, they noticed that some of their tools were missing. Ms. Romo asked Kevin Tugmon, a cousin of Davis who was staying with him at the time, if he knew anything about the missing tools. Tugmon says that Ms. Romo accused him of taking the tools. Tugmon did not respond and returned to the Davis house where he related the conversation to the Davises. Davis told Tugmon that he should ask the Romos about a ladder they borrowed from the Davises but had not returned.

Ms. Romo called the police to report the theft but made no accusation against Tugmon or Davis. Burleson arrived in response to Ms. Romo's call and was taking a report from Ms. Romo when Davis came out of his home and approached the fence line between the two properties. Apparently thinking that Romo was making an accusation against Tugmon, Davis, who was visibly upset, challenged her and asked about his own ladder. Burleson approached Davis, by this time agitated and loud, and asked what the problem was. Davis repeated his concern to Burleson, who then asked Davis to return to his home. At some point, Burleson asked Davis for identification, but he did not attempt to arrest Davis or tell him he was under arrest at that time.

According to Burleson, Davis did not produce identification but began to walk home. Burleson followed Davis, and Davis asked Burleson to leave, which Burleson refused to do. Burleson later explained that he did not leave because he felt Davis was interfering with his investigation. Megan Davis, who was watching the incident from the front window of her house, states that when Davis and Burleson got close to the door, Burleson began ducking and dodging around Davis in order to get through the front door, which Davis was guarding like a basketball player.

2

Burleson claims that Davis suddenly turned and attacked him as they were nearing the door. However, Ms. Davis believes that Burleson may have hit Davis on the back with his flashlight, since there is testimony that Burleson was carrying his flashlight, and there were marks on Davis's back that are consistent with being hit with a flashlight.  Burleson states that as the altercation escalated, Davis was choking him from behind while also pinning down both of his arms, making it impossible to reach for his weapons.  Ms. Davis and Tugmon, who both came out of the house while Burleson and Davis were fighting, state that Davis was not choking Burleson but did have him in a bear hug. Ms. Davis has testified that she told her husband to let go of Burleson as soon as she saw them.  Ms. Romo, who was standing at her door, could hear Ms. Davis tell Davis to get off of Burleson but could not see the fight.

Davis released Burleson and stepped back two or more steps.  Ms. Davis stated that Davis was approximately eight feet away from Burleson and dusting himself off when Burleson shot Davis in the abdomen two times.  It is undisputed that Davis made no furtive or threatening gestures and was not attempting to flee.  Burleson has testified that he was afraid that he would pass out and Davis would then continue to attack him.  Davis was unarmed at the time he was shot, and there was no reason to suspect that he might be armed.  Burleson does not dispute this, but claims that he was worried that Davis would use one of the many tools that were lying around as a weapon.

After the shooting, Burleson reported that shots were fired.  While waiting for other officers to arrive, he told Tugmon to stay away from Davis but that he could go inside to be with the kids. Tugmon and Ms. Davis have testified that Burleson seemed physically alert and calm immediately after the shooting.  By the time other officers arrived, Burleson was sitting down and was allegedly too weak to move or speak well.  When the other officers arrived, they moved Ms. Davis to the curb, and prevented her from being with her husband.  None of the officers on the scene attempted to help

Davis while they were waiting for EMS to arrive.  EMS personnel attempted to stabilize Davis when they arrived.  Davis was transported to the hospital where he died of his wounds.

At the scene, the Montgomery County Sheriff's Office interviewed Ms. Davis, Tugmon, and Mr. and Ms. Romo.  The County investigated the shooting but determined that Burleson had not violated Sheriff's Department policy regarding the use of deadly force.  Davis's death was also investigated by the Texas Rangers for possible criminal wrongdoing.  The case was presented to a grand jury, which declined to return an indictment.

## II. LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56©); *see also Christopher Village, L.P. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  There must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Only when the moving party has discharged this

4

initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue for trial; otherwise, summary judgment will be entered in favor of the movant. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163-64 (5th Cir. 2006). The court must (1) review all of the evidence in the record without making credibility determinations or weighing any evidence, (2) disregard any evidence favorable to the moving party that the jury is not required to believe, and (3) give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Inc. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate fact." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985). When a party is asserting immunity, "[t]he moving party is not required to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity. Once the [movant] asserts this affirmative defense, the burden shifts to the plaintiff to rebut it." *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (citing *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir. 2003)).

### B. Qualified Immunity Standard

Government officials, including Davis, are entitled to immunity from civil damages unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). The threshold issue in a qualified immunity analysis is whether an official's conduct violated a constitutional right, based on the facts alleged and taken in the light most favorable to the party asserting the injury. *See Saucier v. Katz*, 553 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If no constitutional right was violated, the court need inquire no further. *Id.* If, however, a constitutional violation occurred, the second inquiry is whether the official could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right. *Id.* at 206.

### III. ANALYSIS

### A. Officer Liability for Excessive Force

Ms. Davis claims that Burleson used excessive force during his confrontation with Davis. Burleson contends that deadly force was reasonable and necessary under the circumstances.

Claims that law enforcement officers used excessive force are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). In order to make a claim for excessive force pursuant to § 1983 and the Fourth Amendment, a plaintiff must show "(1) injury, (2) which resulted directly from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (citing *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994)). To determine the reasonableness of a defendant's actions, the court pays "careful attention to the facts and circumstances of each particular case, including the severity of the

crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade an arrest by flight." *Id.* at 753 (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998)).

The "calculus of reasonableness" must allow for the reality that "police officers are often forced to make split-second judgments" about a particular situation "in circumstances that are tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 396-97. This court must determine the reasonableness of the officer's use of force in light of the facts and circumstances confronting him at the time he acted, without regard to his underlying intent or motivation. *Id.* at 396-97 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.") The question must be viewed from the perspective of a reasonable officer on the scene, not "with the 20/20 vision of hindsight." *Id.* at 396. The question for this court is whether no reasonable officer could have believed that the level of force used by the officer was necessary under the circumstances of the case. *Id.*

### 1. Constitutional Violation

It is undisputed that Davis was injured and that the injury was caused by Burleson's use of deadly force. The only question for the court is whether plaintiff's factual allegations show a use of deadly force that was clearly excessive and objectively unreasonable. The court finds that they do. The Supreme Court has held that "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.' But '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543

U.S. 194, 197-98, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) (citing *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 443 (1989)).

Here, Burleson claims that Davis had been choking him and that he was worried that he might suffer deadly harm. However, two eyewitnesses say that Davis was not choking Burleson, and in any event, had already retreated and was standing still roughly eight feet away from Burleson at the time he was shot. It is undisputed that Burleson and Davis were involved in a physical altercation in which Burleson was restrained to some degree. Even if Burleson was in danger at one point, Ms. Davis alleges that the danger had passed once Davis had retreated. Fifth Circuit law is clear that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 413 (5th Cir. 2009); *see also Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007). Given plaintiff's account of the physical altercation and the subsequent retreat, the court finds that the facts alleged support a finding that the use of deadly force against Davis was clearly excessive and objectively unreasonable. Accordingly, the court finds that plaintiff has alleged a violation of the Fourth Amendment.

### 2. Clearly Established Right

Having determined that the facts alleged state a constitutional violation, the court must now determine whether the violated right was clearly established on December 13, 2005. Central to this inquiry is the concept of "fair warning." *Lytle*, 560 F.3d at 417. "While the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." *Id.* (citing *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)). However, the principle stated above, that "a police officer may not seize an unarmed, nondangerous suspect by shooting him dead" has long

been clearly established. *Garner*, 471 U.S. at 11.  Plaintiff's allege that Davis was shot dead while he was unarmed and nondangerous.  Accordingly, Burleson is not entitled to summary judgment on his qualified immunity defense.

### B.  Municipal Liability for Excessive Force

Montgomery County, as a local government entity, is liable to plaintiff in this instance only if the Montgomery County Sheriff promulgated or adopted a policy that was the "moving force" that caused one of its employees to violate Davis's constitutional rights.  *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  To invoke municipal liability under *Monell*, a plaintiff must first establish that an employee of the local governmental entity violated his constitutional rights.  In the absence of a constitutional violation, the question of municipal liability is moot.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986).

Municipal liability under section 1983 requires proof of (1) a policy maker; (2) an official policy; and (3) a violation of a constitutional right whose moving force is the policy or custom.  An official policy can be "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy."  *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).  In the instant case, Montgomery County can only be liable to plaintiff if there is either an unconstitutional action by an official policy maker or a policy or custom that caused the deprivation of Davis's constitutional right.  *See Monell,* 436 at 694; *Johnson v. Deep East Tex. Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004).  Plaintiff alleges that the County (1) had a practice of failing to fully investigate officer-involved shootings,

(2) failed to properly train its officers in the appropriate use of deadly force, and (3) ratified Burleson's conduct.

### 1. Failure to Investigate

Plaintiff claims that the County's policy of under-investigation of alleged police misconduct is designed to exonerate officers whenever possible and that the policy resulted in the violation of Davis's Fourth Amendment rights.  In support of this claim, plaintiff's response (Dkt. 40) cites evidence of the following:

> 1) When additional officers arrived on the scene, any officer standing near Burleson turned off his microphone.
>
> 2) The County waited two days to take a statement from Burleson, and no follow-up interviews were conducted.  (Dkt. 40, Ex. H).
>
> 3) The County fully accepted Burleson's account of the facts even though it was inconsistent with other eyewitnesses, and portions of Burleson's statement were implausible.[2]
>
> 4) The investigating officer misrepresented the statement of Ms. Romo by stating that she witnessed a choking, when in fact, her statement did not say that. (Dkt. 40, Ex. H).
>
> 5) The investigation ignored evidence that Burleson was talking while he was allegedly being choked.
>
> 6) The officers on the scene allowed Davis to die without attempting to render aid while simultaneously preventing Ms. Davis from rendering aid.[3]

---

[2]Plaintiff refers specifically to Burleson's testimony that Davis was choking him while other eyewitnesses maintain that he was not, and the implausibility that Davis could be pinning down Burleson's arms at the same time as he was choking him, as Burleson claims.

[3]Plaintiff provides audio and video evidencing her claim that the officers did not render aid.  Plaintiff interprets the evidence as showing a "concerted effort by [the County] to ensure there would be only one story."  Dkt. 40 at 24.  Defendants apparently anticipated that this evidence was going to be used by plaintiff to make a claim for failure to render aid, and addressed this claim in their motion.  The pleadings and response indicate that Plaintiff is indeed making no such claim, and is only using the evidence in support of her argument regarding

"A [municipal] policy of inadequate officer discipline could be unconstitutional if it were pursued with deliberate indifference toward the constitutional rights of citizens.  The question is how to prove the existence of such a policy.  One indication might be a purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory."  *Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001).  Plaintiff has alleged all of these things and has provided evidence in support of her allegations.  (Dkt. 40).

However, "a customary municipal policy cannot ordinarily be inferred from single constitutional violations."  *Piotrowski*, 237 F.3d at 581.  "Isolated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability."  *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).  Plaintiff has provided evidence that interviewing Burleson only once was an official County policy, but she has not offered any evidence, or even alleged, that the other aspects of under-investigation observed in Davis's case have been complained of before or were present in other cases.[4]  Accordingly, the one-interview policy is the only aspect of the investigation that could arguably qualify as an "official policy" for section 1983 purposes.[5]

---

under-investigation.  Dkt. 40.

[4]Montgomery County Chief Deputy Randy McDaniel confirmed the one-interview policy but stated that it was intended to avoid the appearance of the County trying to influence the testimony of an officer after receiving information from his initial interview.  Moreover, he stated that they would conduct an additional interview if one were necessary.  Dkt. 40, Ex. N.

[5]As discussed more extensively below, a single incident can give rise to liability where "the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train."  *Burge v. St. Tammany Parish (Burge II)*, 336 F.3d 363, 373 (5th Cir. 2003).  However, where the alleged under-investigation occurred **after** the constitutional violation, the exception is inapplicable.  The analysis would be different if Ms. Davis had alleged even one under-investigation prior to Davis's shooting death.

In order for the County to face liability based on the one-interview policy, the policy must be the moving force behind the alleged constitutional violation.  Plaintiff has offered no evidence that the one-interview policy was a moving force of Davis's constitutional injury.  While a pervasive failure to investigate could lead to constitutional violations, it is substantially less likely that a general policy of only interviewing officers once, without more, would give deputies perceived license to use excessive force without fear of ramifications.  The court finds that plaintiff has not presented evidence that could show that the policy was a moving force behind the violation.  Accordingly, the County cannot face liability based on the under-investigation theory.

### 2. Failure to Train

Ms. Davis alleges that the County failed to train its deputies on the proper standards for use of deadly force against a citizen.  To hold a municipality liable pursuant to section 1983 for constitutional violations caused by inadequate training policies, a plaintiff must prove culpability and causation.  *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998).  The municipal policy must have been adopted with "deliberate indifference" to its known or obvious consequences.  *Id.*; *see also City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact. . . Only where a failure to train reflects 'deliberate' or 'conscious' choice by a municipality–a 'policy' as defined by our prior cases–can a city be liable for such a failure under § 1983.").  Additionally, the failure to train must be the "moving force" behind the alleged constitutional violation.  *Snyder*, 142 F.3d at 795; *cf. Monell*, 435 U.S. at 694.

In its motion for summary judgment, the County shows that all of its deputies have been certified by the Texas Commission on Law Enforcement Standards and Education ("TCLEOSE").

In general, a plaintiff cannot sustain a cause of action for failure to train if a law enforcement department meets the state standards for training of its law enforcement officers. *Conner v. Travis County*, 209 F.3d 794, 798 (5th Cir. 2000). However, Plaintiff has presented evidence that Montgomery County's policy regarding the use of deadly force is inconsistent with the requirements of the United States Constitution. Specifically, Plaintiff points to the testimony of Sergeant Melvin Franklin, the Montgomery County official who conducted the internal affairs investigation of Davis's shooting. Dkt. 40, Ex. H. When asked about Montgomery County's policy regarding the use of force, Sergeant Franklin responded that the key to determining the appropriate level of force is "what the officer may have felt was reasonable." *Id.* This statement of policy, which suggests a subjective standard, is inconsistent with the constitutional requirement of objective reasonableness. *See Graham*, 490 U.S. at 388. As discussed in more detail above, Plaintiff also provides evidence that the County approved of Burleson's actions based on Burleson's feeling that Davis was a threat to him, even when other evidence available to Burleson showed the contrary. This approval is consistent with a policy which condones the use of deadly force based on a subjective analysis. Accordingly, Plaintiff has presented some evidence that the County has trained and disciplined its officers using a policy that is inconsistent with constitutional mandates.

In order to withstand summary judgment, plaintiff must also provide evidence that the policy was adopted with "deliberate indifference." *Snyder*, 142 F.3d at 795. A finding of deliberate indifference "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 427 (5th Cir. 2006). However, when "the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train," a single incident of misconduct can give rise to § 1983 liability. *Burge*, 336 F.3d at 363; *see*

*also Thompson v. Connick*, 553 F.3d 836, 852-53 (5th Cir. 2008). Here, it is highly predictable that a County's deputies will follow standards of behavior adopted and authorized by the County. If those standards are inconsistent with the constitution, it is highly predictable that constitutional violations will occur as a result of the policy. Accordingly, the court finds that plaintiff's version of the facts regarding the County's failure to train its officers on the proper standard for use of deadly force could support a finding of liability under the single-incident exception.

Finally, plaintiff must cite evidence which could prove that the policy was the moving force behind the violation. This causal link is easily established if plaintiff proves that the County was failing to properly train officers regarding the proper standard for use of deadly force, where the injury was caused by Burleson's inappropriate use of deadly force based on what amounts to his subjective feelings. Accordingly, plaintiff has presented a material question of fact, and the County is not entitled to summary judgment on the claim of failure to train.

### 3. Ratification

In *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), the Fifth Circuit considered a case in which several officers opened fire on a non-threatening, unarmed, innocent citizen as he got out of his car. The court found that "because the officers received no reprimands or discharges from the city following such a flagrant use of excessive force, there must have been a preexisting disposition and policy of reckless disregard for life." *Barkley v. Dillard Dept. Stores, Inc.*, 2008 WL 1924178 (5th Cir. May 2, 2008) (citing *Grandstaff*, 767 F.2d at 171-72). The ratification theory from *Grandstaff* is still good law, but the Fifth Circuit has repeatedly said that it is applicable only in the most extreme factual situations. *Snyder*, 142 F.3d at 797-98; *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986). It "does not stand for the proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal

14

behavior can be assumed to have resulted from an official policy." *Coon*, 780 F.2d at 1161.  While the facts alleged by plaintiff support the finding of a constitutional violation, they are not as extreme as those in *Grandstaff*.  Accordingly, the ratification theory of liability is unavailable to the plaintiff in this case.

## IV.  CONCLUSION

Based on the analysis above, it is the court's conclusion that Burleson is not entitled to qualified immunity on plaintiff's excessive force claim.  Accordingly, his motion is DENIED.  The court also concludes that the County is not entitled to summary judgment on plaintiff's excessive force claim based on the theory of failure to train.  The County is entitled to summary judgment on plaintiff's excessive force claim based on the theories of failure to investigate and ratification. Accordingly, the motion is GRANTED IN PART and DENIED IN PART.  Plaintiff may proceed to trial on her claims.

SIGNED at Houston, Texas on April 30, 2009.

Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY